# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 5, 2013

No. 12-10386

Lyle W. Cayce
Clerk

In the Matter of: RENAISSANCE HOSPITAL GRAND PRAIRIE
INCORPORATED,

Debtor.

-----------------------------------------------------------------------------------

FIRST NATIONAL BANK; METROBANK N.A.,

Appellees,

v.

CRESCENT ELECTRIC SUPPLY COMPANY; HAJOCA CORPORATION,
doing business as Easter & Sons Supply; INNOVATIVE PLUMBING
SERVICES, INCORPORATED; METROPOLITAN PROFESSIONAL
ELECTRICAL SERVICES, INCORPORATED, doing business as Metro
Electric,

Appellants.

Appeals from the United States District Court
for the Northern District of Texas

Before STEWART, Chief Judge, and DAVIS and CLEMENT, Circuit Judges.
CARL E. STEWART, Chief Judge:

Plaintiffs-Appellants, Innovative Plumbing Services, Inc. ("IPS") and
Metropolitan Professional Electrical Services, Inc. ("MPES") challenge the
district court's final judgment, reversing and vacating the bankruptcy court's

No. 12-10386

amended judgment, that their mechanics' liens on the property of Debtor, Renaissance Hospital Grand Prairie Inc. ("RHGP")[1] did not pertain to materials or labor supplied before September 1, 2006, the date on which Defendant-Appellee, MetroBank N.A. ("MetroBank") perfected its deed of trust lien. Additional Plaintiffs-Appellants, Hajoca Corp. ("Hajoca") and Crescent Electric Supply Co. ("Crescent") challenge the bankruptcy court's determination that their mechanics' liens also did not pertain to materials or labor supplied before September 1, 2006, which the district court upheld.[2]  Additional Defendant-Appellee, First National Bank ("FNB") is a party to this litigation as a participant in MetroBank's loan to RHGP.[3]

For the reasons provided herein, we AFFIRM the final judgment of the district court, which previously had reversed and vacated the amended judgment of the bankruptcy court.

## I. BACKGROUND

**A.    Facts**

On August 31, 2006, RHGP purchased an abandoned hospital site (the "Hospital") with the proceeds of a secured $7,000,000 purchase money note from MetroBank.  In order to perfect its deed of trust lien, MetroBank recorded the deed of trust and a security agreement in the Tarrant County, Texas land records on September 1, 2006.[4]

---

[1] Renaissance Healthcare Systems, Inc. ("RHS") is a distinct corporate entity to which RHGP is related.  Another hospital related to RHS is Renaissance Hospital Dallas ("RHD"). In their briefs, the parties refer to RHGP and RHS indiscriminately.  For simplicity, we refer to both as RHGP, except where it is necessary to distinguish between RHGP, RHD, and RHS.

[2] Collectively, we refer to IPS, MPES, Hajoca, and Crescent as the "Lien Claimants."

[3] Collectively, we refer to MetroBank and FNB as the "Lenders."

[4] The deed of trust contained a future advances clause.

No. 12-10386

At the time of the purchase, RHGP intended to renovate the Hospital, which was without water supply or electrical power. To this end, RHGP contracted with IPS to provide plumbing services for the renovation project. Similarly, RHGP contracted with MPES to provide electrical services.[5]

To fund the renovation project, RHGP secured $26,000,000 in additional financing from MetroBank on February 6, 2007. The deed of trust secured both loans, which amounted to $34,033,053.37 as of the date of RHGP's bankruptcy petition. On February 14, 2007, MetroBank sold FNB an undivided participation in the loans.

On January 15, 2008, MPES recorded a mechanic's lien on the Hospital site in the Tarrant County land records. MPES did not pay its subcontractor, Crescent, for electrical materials used in the renovation project. Instead, on March 14, 2008, Crescent recorded its own mechanic's lien on the Hospital site.

On February 13, 2008, IPS recorded a mechanic's lien on the Hospital site in the Tarrant County land records. IPS did not pay its subcontractor, Hajoca, for plumbing materials used in the renovation project. Instead, on February 1, 2008, Hajoca recorded its own mechanic's lien on the Hospital site.

## B.    Proceedings Before the Bankruptcy Court

### 1.    RHGP's Filing for Bankruptcy Protection

RHGP filed for reorganization under Chapter 11 of the U.S. Bankruptcy Code on August 21, 2008. On September 23, 2009, the bankruptcy court converted RHGP's case into a Chapter 7 liquidation. Thus, the Hospital renovation project never was completed.

### 2.    The Bankruptcy Court's Compromise Order

#### a.    MetroBank's Trustee's Sale

---

[5] An additional electrical contractor named J.W. Electric, which is not a party to this appeal, also provided electrical services for the renovation project.

No. 12-10386

On January 2, 2009, RHGP and the Lenders jointly moved, pursuant to Federal Rule of Bankruptcy Procedure 9019, for the bankruptcy court's approval for the Lenders to foreclose on the Hospital. The bankruptcy court granted the joint motion and, on January 30, 2009, entered a compromise order that (i) lifted the automatic stay with respect to the Hospital; and (ii) allowed the Lenders to foreclose; but (iii) required the Lenders to credit bid the Hospital for at least $27,000,000. MetroBank conducted a trustee's sale in March 2009, in which it credit bid the Hospital for $27,000,000.

### b.     The Lenders' Objections to Liens Claimed by MPES, Crescent, and Hajoca

The bankruptcy court's compromise order additionally provided for the Lenders to file notice of their objections to any party claiming a superior interest in the proceeds of the trustee's sale. MPES, Hajoca, and Crescent, *inter alios*, claimed liens with priority over the deed of trust. Accordingly, on February 18, 2009, the Lenders filed notice of their objections.

Of note, IPS did not directly claim a lien. In 2008, IPS had assigned its lien to Hajoca in consideration for Hajoca forbearing its right to immediate suit for payment from IPS. While Hajoca did directly claim its own recorded lien, Hajoca did not assert its rights as IPS's assignee until later at trial.[6]

### 3.     The Parties' Scheduling Agreement Concerning Priority-of-Liens Issues

In order to narrow the outstanding priority-of-liens issues for trial, the various parties reached a scheduling agreement. Pursuant to that agreement, the Lenders moved for partial summary judgment as to the date the deed of trust related back, and the Lien Claimants entered into stipulations regarding the dates that they first supplied visible materials or labor to the renovation

---

[6] Hajoca represents that its own recorded lien (in contrast to the lien assigned by IPS) is "derivative" to IPS's recorded lien (the assigned lien). Similarly, Crescent represents that its recorded lien is "derivative" to MPES's recorded lien.

project. The parties reached this agreement at a stage prior to the close of discovery. Counsel for MetroBank drafted the stipulations.

### a.    The Lien Claimants' Stipulations

#### i.    IPS and Hajoca

IPS stipulated: "The date that [IPS] performed its first visible work or delivered its first visible materials (as defined by section 53.124 of the Texas Property Code and Texas case law) was on or after October 9, 2006 but before February 22, 2009."

Hajoca similarly stipulated: "The date that [Hajoca] performed its first visible work or delivered its first visible materials (as defined by section 53.124 of the Texas Property Code and Texas case law) was on or after October 9, 2006 but before February 22, 2009."

Misti Beanland, counsel for Crescent and Hajoca—but not IPS, executed both stipulations. In executing the stipulations, Beanland specifically referred to herself as "Counsel for Crescent Electric Supply Company, Hajoca Corporation d/b/a Easter & Sons Supply and Innovative Plumbing Services" in her signature block.[7]

#### ii.    MPES and Crescent

MPES stipulated: "The date that [MPES] performed its first visible work or delivered its first visible materials (as defined by section 53.124 of the Texas Property Code and Texas case law) was before September 1, 2006."

Crescent stipulated: "The date that [Crescent] performed its first visible work or delivered its first visible materials (as defined by section 53.124 of the

---

[7] As discussed below, since IPS did not directly claim a lien, but Hajoca ultimately asserted its rights as IPS's assignee, the Lenders (on the one hand) and the Lien Claimants (on the other) presently dispute whether Beanland's stipulation, which she purports to have executed on behalf of Hajoca, can be imputed to IPS. MPES, which has separate counsel, is not a party to this specific sub-dispute.

No. 12-10386

Texas Property Code and Texas case law) was on or after September 2, 2006 but before October 9, 2006."

Thus, all Lien Claimants other than MPES stipulated that they performed their first visible work or delivered their first visible materials after September 1, 2006.

### b. MPES's Representations to Counsel for the Lenders and Response to MetroBank's Interrogatories

On February 5, 2009, counsel for MPES submitted a letter to counsel for the Lenders, in which MPES represented that it had "commenced work on the [hospital] project on or about September 18, 2006." MPES added that "materials were first delivered to the project . . . on or about September 4, 2006." In the letter, Counsel for MPES specifically linked MPES's above representations to the date that MPES's lien incepted: "[T]he inception of [MPES's] mechanic's and materialman's lien relates back to the date labor was first performed or materials were first delivered to the project."

More than six months later, on September 11, 2009, MPES responded to interrogatories from MetroBank with a sworn statement from its President that MPES had "commenced construction on or about September 13, 2006." Thus, MPES confirmed that it had not delivered materials or commenced labor before September 1, 2006.

MPES presently submits that it "timely supplemented" its interrogatory response, on November 20, 2009, to state instead that it had "[begun] work on the project" in June 2006.

### 4. The Bankruptcy Court's Disposition of the Lenders' Pre-Trial Motion for Partial Summary Judgment

On January 26, 2010, the bankruptcy court granted the Lenders' motion for partial summary judgment. The following issues remained for trial: (i) whether IPS or MPES had supplied visible materials or labor to the renovation

No. 12-10386

project before September 1, 2006;[8] and (ii) whether there had been a "general contractor arrangement" within the meaning of *McConnell v. Mortgage Investment Co.* and its progeny, 305 S.W.2d 280, 283-86 (Tex. 1957), which would have allowed the various claimants' liens to relate back regardless.[9]

### 5. The Bankruptcy Court's August 2010 Trial Decision

After a five-day trial, conducted in April and May 2010, the bankruptcy court issued its decision on August 25, 2010.

The bankruptcy court determined, *inter alia*: (i) that IPS and MPES had supplied materials and labor before September 1, 2006 but, in light of their stipulations, Hajoca and Crescent had not; (ii) that there had been no general contractor arrangement; (iii) that Beanland's stipulation could not be imputed to IPS because IPS was not her client; and (iv) that Beanland had referred to herself as "Counsel for . . . [IPS]" in her signature block only because IPS had assigned its lien to Hajoca.

Accordingly, on October 12, 2010, the bankruptcy court entered its judgment, overruling the objections of the Lenders as to the priority of IPS and MPES's liens.

At the request of MPES, the bankruptcy court issued a decision on December 29, 2010 to amend its judgment, to allow for MPES to recover the amount of its lien jointly and severally from the Lenders. The bankruptcy court entered its amended judgment on January 31, 2011.

---

[8] As documented above, Hajoca and Crescent stipulated that they had not supplied visible materials or labor before September 1, 2006. IPS did as well, but the bankruptcy court reserved judgment—as to whether Beanland's stipulation on behalf of Hajoca bound IPS—for its August 25, 2010 trial decision.

[9] No party has appealed the bankruptcy court's January 26, 2010 ruling on partial summary judgment.

No. 12-10386

## C.    Proceedings Before the District Court

The Lenders appealed the bankruptcy court's decision—as to the priority of IPS and MPES's liens—to the district court. In a March 12, 2012 decision, *In re Renaissance Hospital Grand Prairie, Inc.*, No. 4:11-cv-311-A, 2012 WL 826334 (N.D.Tex. Mar. 12, 2012), the district court reversed the bankruptcy court as to the respective dates IPS and MPES had first supplied materials or labor.[10]

### 1.    Texas's Statutory "Visible from Inspection" Requirement for the Inception of Mechanic's Liens

In holding that neither IPS nor MPES had supplied materials or labor before September 1, 2006, the district court noted that under Section 53.124 of the Texas Property Code:

> (a) Except as [otherwise] provided . . . for purposes of Section 53.123, the time of inception of a mechanic's lien is the commencement of construction of improvements or delivery of materials to the land on which the improvements are to be located and on which the materials are to be used. (b) The construction or materials under Subsection (a) must be *visible from inspection* of the land on which the improvements are being made. . . .

Tex. Prop. Code Ann. §§ 53.124(a)-(b) (West 2007) (emphasis added). Thus, any materials delivered or labor commenced would have had to be "visible from inspection." *In re Renaissance*, 2012 WL 826334, at \*5.

### 2.    Additional *Diversified Mortgage* Requirements Pertaining to "Notice" for Secured Lenders

Moreover, the district court noted that under Section 53.123 of the Texas Property Code:

---

[10] IPS had not directly participated in the bankruptcy court proceedings. Nevertheless (i) the bankruptcy court's decision had the potential to affect IPS's financial interests; (ii) the Lenders had designated IPS as a party-opponent in their subsequent district court brief; and (iii) IPS had filed a district court brief in response. *In re Renaissance*, 2012 WL 826334, at \*1 n.1. For these reasons, the district court permitted IPS to intervene in the proceedings. *Id.*

> (a) Except as [otherwise] provided . . . a mechanic's lien attaches to the . . . [real] property in preference to any prior lien, encumbrance, or mortgage on the land on which it is located, and the person enforcing the lien may have the . . . property sold separately.  (b) The mechanic's lien does not affect any lien, encumbrance, or mortgage on the land or improvement at the time of the inception of the mechanic's lien, and the holder of the lien, encumbrance, or mortgage need not be made a party to a suit to foreclose the mechanic's lien.

Tex. Prop. Code Ann. § 53.123 (West 2007).  The district court explained that, in *Diversified Mortgage Investors v. Lloyd D. Blaylock General Contractor, Inc.*, 576 S.W.2d 794 (Tex. 1978), the Texas Supreme Court had interpreted the precursor to Section 53.123, when read together with the precursor to Section 53.124, to have "clearly provide[d] additional standards or conditions which must exist before a mechanic's lien is incepted.  *Diversified Mortg.*, 576 S.W.2d at 801.

With respect to the delivery of materials, *Diversified Mortgage* held that, in order to incept a lien, the material (i) must have been delivered to the construction site; (ii) must be "visible from inspection"; and (iii) must constitute "either . . . material which will be consumed during construction or . . . material which will be incorporated in the permanent structure."  *Id.* at 803.  With respect to the commencement of labor, *Diversified Mortgage* held that, in order to incept a lien, the labor (i) must have been conducted on the construction site; (ii) must be "visible from inspection"; and (iii) must constitute "the placing of something of permanent value on the land," rather than mere "preliminary or preparatory activities or structures."  *In re Renaissance*, 2012 WL 826334, at *6 (interpreting *Diversified Mortg.*, 576 S.W.2d at 802).

The District Court surveyed the property law of other American jurisdictions before concluding that *Diversified Mortgage* was consistent with them in ensuring that secured lenders be provided sufficient notice of ongoing

construction activities, that might give rise to future mechanic's liens, before those lenders were to provide potentially subordinate financing. *See In re Renaissance*, 2012 WL 826334, at *7-8.

### 3.    The District Court's Application of the Above Standards

Applying the above standards, the district court reversed the bankruptcy court with respect to IPS and MPES. The district court held that any delivery of materials or commencement of labor, by IPS or MPES, was no more than "preliminary or preparatory" before September 1, 2006.

The district court further held that the bankruptcy court had failed to make findings as to the "visibility from inspection" of any materials delivered or labor commenced. However, rather than remand back to the bankruptcy court, the district court itself found that any materials delivered or labor commenced, by either IPS or MPES, had not been "visible from inspection."[11]

As a separate ground for reversal, with respect to IPS, the district court observed that it would hold that Beanland's stipulation could be imputed to IPS on the basis of the privity of its assignment contract with Hajoca. *See In re Renaissance*, 2012 WL 826334, at *4 n.9 (citing *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 285-92 (2008)). Nevertheless, the district court noted that it did not have to make a definitive holding on the issue because it already had determined that IPS had not sufficiently delivered materials or commenced labor before September 1, 2006. *See id.* at *15.

The district court upheld the bankruptcy court with respect to Hajoca and Crescent.

---

[11] As discussed below, it is evident that neither IPS nor MPES supplied cognizable materials or labor before September 1, 2006, whether "visible from inspection" or not. Therefore, we need not reach the issue of whether the district court should have remanded to the bankruptcy court to make the findings in the first instance.

Accordingly, the district court vacated the amended judgment of the bankruptcy court and entered final judgment in favor of the Lenders. The Lien Claimants timely appealed.

## II. STANDARD OF REVIEW

**A.    Applicable Standard to the District Court in Reviewing the Bankruptcy Court**

"When reviewing a bankruptcy court's decision in a 'core proceeding,' a district court functions as a appellate court and applies the standard of review generally applied in federal court appeals." *Matter of Webb*, 954 F.2d 1102, 1103-04 (5th Cir. 1992) (citation and footnote omitted). Under this standard of review, "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr. P. 8013. Factual findings "based on determinations regarding the credibility of witnesses" demand "even greater deference" because "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 575 (1985) (citation omitted).

"A 'core proceeding' is one that invokes a substantive right provided by . . . the Bankruptcy Code . . . [or] is a proceeding that by its nature could arise only in the context of a bankruptcy case." *Webb*, 954 F.2d at 1104 n.1 (citation and internal quotation marks omitted). "Core proceedings include, but are not limited to . . . determinations of the validity, extent, or priority of liens." 28 U.S.C. § 157(b)(2)(K) (2006).

The U.S. Supreme Court has construed the term "clearly erroneous" as follows:

> Although the meaning of the phrase "clearly erroneous" is
> not immediately apparent, certain general principles . . .

> may be derived from our cases.  The foremost of these principles . . . is that a finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.  This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. . . . If the [trial] court's account of the evidence is plausible in light of the record viewed in its entirety, the [reviewing] court . . . may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.  Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson*, 470 U.S. at 573-74 (citations and internal quotation marks omitted).

"Generally, a bankruptcy court's findings of fact are reviewed for clear error and conclusions of law are reviewed de novo." *In re Gerhardt*, 348 F.3d 89, 91 (5th Cir. 2003) (citation omitted).  However, for a "mixed question of law and fact," the "factual premises" are reviewed for clear error but the ultimate "legal conclusion" is reviewed de novo.  *Whitehouse Hotel Ltd. P'ship v. C.I.R.*, 615 F.3d 321, 333 (5th Cir. 2010) (citations omitted).[12]

---

[12] In light of the U.S. Supreme Court's decision in *Stern v. Marshall*, ___ U.S. ___, 131 S.Ct. 2594, 2620 (2011), the parties dispute whether the district court should have applied de novo or clear error review to the bankruptcy court's lien inception date findings.  The Lenders correctly note that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) ("Core proceedings include, but are not limited to . . . counterclaims by the estate against persons filing claims against the estate"), at least with respect to "state law counterclaim[s] that [are] not resolved in the process of ruling on a creditor's proof of claim."  131 S.Ct. at 2620.  Despite *Stern*'s express instruction that its holding applied only "in one isolated respect," the Lenders argue that the logic of *Stern* would apply equally to Section 157(b)(2)(K) (. . . determinations of the validity, extent, or priority of liens).

Were we to adopt the Lenders' reading of *Stern*, the appropriate standard of review for the bankruptcy court's factual findings, as to the respective dates IPS and MPES first supplied materials or labor, would be de novo rather than clear error.  The Lenders' reading, however, is highly implausible.  While *Stern*'s "in one isolated respect" language may understate the totality of the encroachment upon the Judicial Branch posed by Section 157(b)(2), which enumerates a list of "core proceedings," the determination of the priority of liens is not likely

No. 12-10386

## B.    Applicable Standard to This Court in Reviewing the District Court

This Court "review[s] the decision of a district court, sitting as an appellate court, by applying the same standards of review to the bankruptcy court's findings of fact and conclusions of law as applied by the district court." *Gerhardt*, 348 F.3d at 91 (citation omitted).

## III. DISCUSSION

## A.    Introduction

At issue is whether the bankruptcy court clearly erred in determining that IPS and MPES had supplied materials or labor before September 1, 2006, but Hajoca and Crescent had not. We find that it did.

In short, IPS's stipulation created a strong presumption that IPS had not supplied anything more than "preliminary or preparatory" materials or labor before September 1, 2006. The same can be said of MPES with respect to its representations to the Lenders' counsel and initial interrogatory response. Even on highly deferential *Anderson/Webb* review, the bankruptcy court's factual findings cannot overcome these presumptions.

Moreover, Hajoca and Crescent themselves have acknowledged that their claims are "derivative" to those of IPS and MPES. Therefore, Hajoca and Crescent's claims fall for the same reasons that IPS and MPES's claims do.

Accordingly, the bankruptcy court's determinations concerning IPS and MPES were clearly erroneous, but its determinations concerning Hajoca and Crescent were correct.

---

such an encroachment. *See, e.g.*, *In re Bigler LP*, 458 B.R. 345, 370-71 & n.24 (Bankr. S.D.Tex. Aug. 19, 2011); *In re Quality Props., LLC*, Bankr. No. 10-42783, Adversary No. 10-40132, 2011 WL 6161010, at *4, 6 (Bankr. N.D.Ala. Nov. 29, 2011) (unpublished).

Nevertheless, the bankruptcy court's determination that IPS and MPES supplied materials or labor before September 1, 2006 cannot withstand either de novo or clear error review. Thus, we leave it for future courts to flesh out the effect of *Stern* more definitively.

## B.    Analysis

### 1.    Whether IPS Is Bound by Beanland's Stipulation

To recap, during the pre-trial partial summary judgment proceedings, IPS stipulated: "The date that [IPS] performed its first visible work or delivered its first visible materials (as defined by section 53.124 of the Texas Property Code and Texas case law) was on or after October 9, 2006 but before February 22, 2009." Misti Beanland, counsel of record for Crescent and Hajoca—but *not* IPS, executed the stipulation. In executing the stipulation, Beanland specifically referred to herself as "Counsel for . . . Innovative Plumbing Services" in her signature block.

The bankruptcy court and district court differed as to how to treat this odd set of circumstances. The bankruptcy court noted that Beanland was not counsel for IPS, and therefore could not bind IPS with the stipulation. *See* 7 Am. Jur. 2d *Attorneys at Law* § 147 (2013) ("A lawyer may not act beyond the scope of the contemplated representation without additional authorization from the client.").

By contrast, the district court noted that it did not need to reach this stipulation issue. However, the district court added that, if it did, it would hold that Beanland's identical stipulation for Hajoca would bind IPS under *Sprint*, 554 U.S. at 285-92, on account of the privity of their assignment contract.

Our approach to this issue differs from that of either court below. It is grounded in the specific and unusual facts of this case. First, Beanland's stipulation is signed "Counsel for . . . Innovative Plumbing Services." In and of itself, this is probative, especially since the record evidences no contemporaneous objection by IPS to Beanland's (i) characterization of herself as its counsel; or (ii) characterization of the date that IPS first supplied materials or labor.

Second, Glenn Smith, IPS's President, was Beanland's primary witness at trial with respect to proving the date that IPS first supplied materials or labor.

No. 12-10386

Without Smith's testimony for Hajoca, Beanland would have had little evidence to present on this point. After all, IPS did not have alternative counsel during the bankruptcy proceedings. If not for Hajoca, there would have been no party with an interest in eliciting Smith's testimony. Yet, IPS too benefitted from Hajoca's prosecution of the assigned lien. Were Beanland unsuccessful for Hajoca, IPS still would be liable to Hajoca for Hajoca's costs as a subcontractor on IPS's contract with RHGP. In these unique circumstances, where the parties' interests were significantly aligned and IPS did not have record counsel of its own, Beanland in essence was IPS's counsel.

Finally, even in these Fifth Circuit proceedings, IPS has relied on Beanland's advocacy when it suits IPS's purposes. *See, e.g.*, Oct. 5, 2012 Letter from IPS's Counsel (joining in and adopting large parts of Hajoca's reply brief in lieu of submitting its own reply brief). This is not consistent with a party sincerely contesting the imputation of Beanland's stipulation to it.

On these specific and unusual facts, the argument that Beanland could not bind IPS is unavailing. Accordingly, IPS is bound by Beanland's stipulation.[13]

### 2. Whether the Lien Claimants' Stipulations, Which Preceded the Close of Discovery, Were Limited to the Pre-Trial Partial Summary Judgment Proceedings

As documented above, IPS, Hajoca, and Crescent all entered into stipulations that they had not supplied materials or labor before September 1,

---

[13] In light of the unique circumstances of this case, which make clear that Beanland's stipulation should be imputed to IPS, we need not make a categorical pronouncement as to when an attorney may bind a party who is not her "client" in the strictest sense of the word. Nor need we definitively reach the proposition, set forth in dicta by the district court, that under *Sprint*, 554 U.S. at 285-92, Beanland could have bound IPS merely on account of the privity of its assignment contract with Hajoca.

First and foremost, *Sprint* is an opinion on the standing—both Article III and prudential—of an assignee to prosecute its assignor's claim. At present, it is enough for us to observe that, despite its arguably broad language, there is minimal written indication that *Sprint* extends into a generalized presumption of imputation, between assignor and assignee, based solely on the privity of their assignment contract.

15

2006. The Lien Claimants argue that, because discovery had not yet closed, the stipulations were limited in applicability to the pre-trial partial summary judgment proceedings at hand and, therefore, are not conclusive.

However, we need not determine whether the stipulations are entirely conclusive.    After all, at a minimum, the stipulations created strong presumptions that the stipulated work commencement/material delivery dates were correct.  As explained below, IPS, Hajoca, and Crescent cannot overcome these strong adverse presumptions.[14]

### 3.    The Effect of MPES's Representations to the Lenders' Counsel and Initial Response to MetroBank's Interrogatories

To recap once again, on February 5, 2009, counsel for MPES submitted a letter to counsel for the Lenders, in which MPES represented that it had "commenced work on the [Hospital] project on or about September 18, 2006." MPES added that "materials were first delivered to the project . . . on or about September 4, 2006."

Furthermore, on September 11, 2009, MPES responded to interrogatories from MetroBank with a sworn statement from its President that MPES had "commenced construction on or about September 13, 2006." Nevertheless, MPES presently submits that it "timely supplemented" its interrogatory response, on November 20, 2009, to state instead that it had "[begun] work on the project" in June 2006.

Similar to IPS, Hajoca, and Crescent, with their adverse stipulations, MPES cannot altogether escape its adverse representations to Lenders' counsel or its adverse initial interrogatory response. That MPES "timely supplemented" its interrogatory response with self-serving changes that wholly contradicted its

---

[14]  To be clear, the tension in this case is between the pre-trial paper record and the bankruptcy court's post-trial factual findings.  Irrespective of the deference afforded a bankruptcy court's factual findings, those findings must reasonably outweigh any undisputed evidence in the paper record that pre-dated trial.

No. 12-10386

initial response is of little moment. At a minimum, MPES's prior representations created the same strong presumption faced by the other Lien Claimants that it had not supplied materials or labor before September 1, 2006. While we acknowledge MPES's supplemental interrogatory response, it is of minimal credibility.

### 4. Whether IPS or MPES Can Overcome the Strong Adverse Presumptions Discussed Above

Neither IPS nor MPES can overcome the strong adverse presumptions discussed above, even on deferential clear error review of the bankruptcy court's decision. Both IPS and MPES point to factual findings by the bankruptcy court in support of its decision, and argue that those findings are entitled to deference. Those findings, and why they are not enough to overcome the above presumptions, can be summarized as follows.

### a. Factual Findings Regarding IPS[15]

IPS submits that it supplied "copper, cast iron, and miscellaneous fillings" in order to "restor[e] water service" and "repair[] a bathroom" at the RHGP Hospital site at "the end of July or beginning of August 2006." In support of this assertion, IPS cites to the trial testimony of Smith, IPS's President. IPS notes that the bankruptcy court found Smith to be credible, and found IPS's work to have been neither "preliminary" nor "preparatory."

IPS concedes that it billed for this work on September 14, 2006. However, Smith testified at trial that it was IPS's standard practice not to bill until "two or three weeks after work had been completed."

Smith conceded that IPS did not have a permit for this work, which he acknowledged would have been necessary had the work been part of the actual

---

[15] For a more exhaustive discussion of the bankruptcy court's factual findings regarding IPS, see the district court opinion at *In re Renaissance*, 2012 WL 826334, at \*11-14.

17

renovation project.[16] Rather, IPS's work during this time period was limited to pre-renovation tasks such as evaluating the property for renovation suitability and restoring running water for use by future renovation workers.

In light of the strong presumption created by its stipulation, it is simply not enough for IPS to rest its case on Smith's conflicting testimony, as this testimony revealed that IPS's work was limited to pre-renovation tasks that would not remain in the building. That IPS did not bill for its work until September 14, 2006 only corroborates its stipulation that it did not commence work before September 1, 2006.

It was unreasonable for the bankruptcy court to give insufficient weight to IPS's stipulation, whether dispositive or merely persuasive, in favor of testimony from IPS's President that was not wholly to the contrary. It also was unreasonable for the bankruptcy court to credit IPS's work as anything other than "preliminary or preparatory" when IPS's own President, who the bankruptcy court deemed to be credible, had conceded in sworn testimony that IPS had not yet obtained the requisite permit for actual renovation work.[17]

---

[16] While a contractor's failure to obtain a permit is not talismanic evidence that the contractor's work is merely "preliminary or preparatory," it is probative evidence to that effect in the absence of countervailing evidence of comparable weight.

[17] In addition to the above-stated reasons why IPS cannot overcome the adverse presumption created by its stipulation, none of IPS's evidence, other than the conflicting testimony of Smith, sheds much light on whether its purported labor or delivery of materials would have been "visible from inspection." Thus, even if IPS could overcome the adverse presumption created by its stipulation, which it cannot, it likely could not satisfy Texas's requirement of notice for secured creditors. *See Diversified Mortg.*, 576 S.W.2d at 801-03; Tex. Prop. Code Ann. §§ 53.123, 53.124(a)-(b) (West 2007). That said, we need not reach the "visible from inspection" issue, which the bankruptcy court failed to address in the first instance.

No. 12-10386

### b.     Factual Findings Regarding MPES[18]

First, MPES submits that it attempted to repair a switchgear at the RHGP Hospital site, and made the decision to order a replacement switchgear, in August 2006.  Second, MPES submits that it installed wiring to a "sump pump motor control center" at the site in June 2006.  Third and finally, MPES submits that it repaired security lights at the site in August 2006.

In support of these assertions, MPES cites to the trial testimony of its President, Micky Cable, as well as to business records, including time sheets for employees and invoices for materials.  MPES notes that the bankruptcy court found Cable to be credible, and credited MPES's business records.  In doing so, the bankruptcy court found that MPES had first commenced construction or delivered materials to the RHGP Hospital site on June 8, 2006.

Notwithstanding the above, MPES concedes that it did not perform the actual replacement of the switchgear until after September 1, 2006.  Furthermore, with respect to the installation of the wiring, MPES concedes that it did not procure the requisite permit for such a project, at least before September 1, 2006.

All things considered, MPES cannot overcome the strong adverse presumption created by its prior representations to the Lenders' counsel and its initial response to MetroBank's interrogatories.  After all, as documented above, MPES did not perform the actual replacement of the switchgear until after September 1, 2006.  Moreover, MPES did not procure a permit for the wiring installation.

As for MPES's evidence of business records that purportedly establish its work on the switchgear, wiring, and security lights, many of those records are

---

[18]  For a more exhaustive discussion of the bankruptcy court's factual findings regarding MPES, see the district court opinion at *In re Renaissance*, 2012 WL 826334, at *8-11.

19

labeled "estimates" rather than "invoices" or "orders," and appear to refer to future rather than completed work. Even more significantly, all of the records are addressed to RHS generally, or to RHD rather than to RHGP.[19] Records addressed to the wrong corporate entity have minimal if any probative value.

Especially in light of MPES's prior representations, it was not reasonable for the bankruptcy court to treat the above evidence as sufficient to establish a work commencement/materials delivery date before September 1, 2006. At best, like IPS, MPES engaged in evaluative, "preliminary or preparatory" work.[20]

Thus, even on deferential clear error review of the bankruptcy court's decision, neither IPS nor MPES can overcome the strong adverse presumptions detailed above. Despite the general proposition—set forth in *Anderson* and *Webb*—that factual findings grounded in trial-testimony credibility determinations are not to be disturbed, we must do so when, as here, we are "left with the definite and firm conviction that a mistake has been committed." *Anderson*, 470 U.S. at 573 (citation and internal quotation marks omitted).

### 5.    Hajoca and Crescent's "Derivative" Claims

Finally, as both Hajoca and Crescent acknowledge, their respective claims are "derivative" to IPS and MPES's claims. Since neither IPS nor MPES can establish that it had delivered materials or commenced labor before September 1, 2006, *a priori*, neither can Hajoca or Crescent. Moreover, just like IPS, both

---

[19] In addition to its work for RHGP, MPES performed work on a separate contract for RHD.

[20] As with IPS, in addition to the above-stated reasons why MPES cannot overcome the adverse presumption created by its prior representations, none of MPES's evidence, other than the conflicting testimony of Cable, sheds much light on whether its purported labor or delivery of materials would have been "visible from inspection." Thus, even if MPES could overcome the adverse presumption created by its prior representations, which it cannot, it likely could not satisfy Texas's requirement of notice for secured creditors. *See Diversified Mortg.*, 576 S.W.2d at 801-03; Tex. Prop. Code Ann. §§ 53.123, 53.124(a)-(b) (West 2007).

Hajoca and Crescent are saddled with strong adverse presumptions created by their respective stipulations.

Thus, the bankruptcy court clearly erred in determining that IPS and MPES had supplied materials or labor before September 1, 2006. The bankruptcy court correctly determined that Hajoca and Crescent had not supplied materials or labor before September 1, 2006.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the final judgment of the district court, which reversed and vacated the amended judgment of the bankruptcy court.