# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 30, 2025

Lyle W. Cayce
Clerk

No. 23-20557

———————

In re Sanchez Energy Corporation, Et al.

*Debtors*,

Ad Hoc Group of Senior Secured Noteholders; DIP Lenders; Wilmington Savings Fund Society, FSB,

*Appellants*,

*versus*

Delaware Trust Company,

*Appellee*.

———————

Appeal from the United States District Court
for the Southern District of Texas
USDC Nos. 4:19-BK-34508,
4:23-CV-02987

———————

Before Jones, Engelhardt, and Oldham, *Circuit Judges*.

Edith H. Jones, *Circuit Judge*:

In 2019, Sanchez Energy Corporation petitioned for bankruptcy protection under Chapter 11. Facing a catastrophic downturn in the oil and gas industry caused by the COVID pandemic, the bankruptcy court rushed to approve in April 2020 a reorganization plan designed to compensate

creditors with equity in a new entity. Disagreement arose between secured and unsecured creditors over proper allocation of the equity. The bankruptcy court sided with the unsecured creditors and awarded them a dominant stake in the new entity after the court hypothetically "valued" various avoidance actions that the reconstituted debtor preserved. We hold that the court's equity allocation contravened the Bankruptcy Code, 11 U.S.C. §§ 550(a) and (d), because it incorrectly approved more than a "single satisfaction" as a remedy for the avoided secured creditors' liens. The judgment must be VACATED and REMANDED for further proceedings.

## BACKGROUND

Sanchez Energy Corporation was a Texas-based oil and gas exploration and production company. Its pre-bankruptcy liabilities included $500 million of secured notes and $1.75 billion of unsecured notes with maturity dates falling between 2021 and 2023. The appellants are a subgroup of secured noteholders (the "Ad Hoc Secured Creditors") that obtained deeds of trust on April 13, 2018, from Sanchez granting nonpossessory liens on virtually all corporate assets. They putatively perfected their liens by filing all-asset financing statements with the Texas Secretary of State or Delaware Department of State. Several of the liens covered valuable oil and gas interests that the parties refer to as the "HHK Leases." Those leases were apparently worth more than all of Sanchez's other assets combined. But the secured creditors never foreclosed on the HHK liens. Though the liens thwarted the unsecured creditors from satisfying any of their delinquent notes with corporate assets, Sanchez continued to operate its wells and to collect proceeds from the sale of processed minerals.

Sanchez stood on the verge of insolvency when it solicited proposals for debtor-in-possession ("DIP") financing in June 2019. The company received indications of interest from eighteen financial institutions in

2

addition to interest from partial groups of its secured and unsecured creditors. Around that same time, the secured creditors realized that their deeds of trust pertaining to the HHK Leases might be insufficiently perfected. They filed correction affidavits between June 27 and July 24, 2019. To prevent the attempted perfection of the secured creditors' liens from occurring outside of the ninety-day preference period, 11 U.S.C. § 547(b), Sanchez and its affiliated debtor companies filed for Chapter 11 bankruptcy protection on August 11, 2019.

Initially, Sanchez received just one financing proposal after filing its petition. That proposal came from a group of its secured creditors. Other interested parties declined to submit proposals at least in part because the secured creditors' liens would threaten their ability to obtain a superpriority or priming lien on almost all corporate assets. Sanchez thus sought and received court approval for interim relief in the form of DIP financing from its secured creditors. A group of unsecured creditors objected and submitted their own proposal for consideration, which, as expected, sought to subordinate the senior creditors' existing liens. Sanchez preferred to avoid a priming fight, so it moved to proceed with a final DIP loan from its secured creditors. The bankruptcy court denied the motion and instructed the parties to keep negotiating. They returned soon after in agreement to adopt a modified version of the secured creditors' ("DIP Lenders") initial proposal. The bankruptcy court approved their negotiated agreement in a Final DIP Order on January 22, 2020.

The Final DIP Order gave Sanchez access to a $200 million superpriority credit facility provided by secured creditors. It also required Sanchez to pay fees, costs, and expenses incurred by creditors involved in the DIP negotiation. The record reflects that Sanchez paid about $15 million to satisfy those obligations. But its financial condition was derailed within a few

months by the COVID pandemic, which sent oil and gas prices barreling into negative territory. Sanchez defaulted on its DIP obligations.

Meanwhile, Sanchez filed an adversary proceeding (the "Lien Challenge Complaint") to recover preferences pursuant to 11 U.S.C. § 547(b) and other claims against the secured creditors. Among numerous claims, the complaint asserted that the secured creditors failed to create or perfect their pre-petition liens on the HHK Leases more than ninety days before the bankruptcy. Specifically, Sanchez's prayer for relief requested a "judgment finding that all transfers . . . are avoided and the Debtors are thus entitled to recovery under § 550." But the litigation was paused nearly as quickly as it began so that Sanchez and its creditors could negotiate a reorganization plan. All major parties—including those to this appeal—consented to postponing litigation of the Lien Challenge Complaint.

With lightning speed, Sanchez filed several different reorganization proposals, and the bankruptcy court approved and confirmed a reorganization plan ("Plan") on April 30, 2020. The Plan paved the way for Sanchez to emerge from bankruptcy as a reconstituted entity named Mesquite Energy, Inc. Important for purposes of this dispute, Article VIII.E of the Plan provided that "on the Effective Date . . . all . . . Liens . . . against any property of the Estates . . . shall be fully released and discharged, and all of the right, title, and interest of any holder of such . . . Lien[s] . . . shall revert to [Mesquite.]" The releases of the DIP liens and secured creditors' liens, even though those liens were then perceived to have no value, allowed Mesquite to be reorganized with a clean balance sheet and no overhanging encumbrances.

Several other provisions of the Plan are relevant. The Plan stipulated a reconstituted enterprise value of $85 million for Mesquite. The DIP Lenders, a group comprising most of the secured creditors, were entitled to

receive at least twenty percent of the stock in exchange for releasing the DIP liens. The remaining equity shares were to be divided between the secured creditors and the unsecured creditors after resolution of the Lien Challenge Complaint and other litigation (collectively, the "Lien-Related Litigation"). Specifically, the Plan prescribed three phases of litigation in the bankruptcy court. In Phase One, the bankruptcy court would decide whether the DIP liens were valid. If the court held for the DIP Lenders, their outstanding $100 million loan would swallow the entire remaining equity of Mesquite. However, if the unsecured creditors (acting through the Delaware Trust Company, as their "Creditor Representative") prevailed, then the court in Phase Two had to determine the validity and enforceability of the secured creditors' pre-petition liens. Finally, if the Creditor Representative succeeded in avoiding the secured creditors' liens, the court would assess the additional "value" to the debtors' estate of those and other claims and allocate the equity proportionally. As long as the Lien-Related Litigation remained unresolved, there was a possibility that the unsecured creditors might receive equity shares.[1]

In Phase One, the bankruptcy court had to interpret the Final DIP Order and determine whether the superpriority DIP liens were coextensive with and inherited any deficiencies of the secured creditors' pre-petition liens. Initially, the bankruptcy court held the DIP liens were unenforceable. But two years later, the court determined that it had overlooked one important issue and reopened the Phase One proceeding. Ultimately, the court held that the DIP Lenders possessed valid liens encompassing the

---

[1] The DIP Lenders waived their right to deficiency claims arising from proceeds of the avoidance actions.

No. 23-20557

HHK Leases.[2]  This holding affirmed the DIP Lenders' entitlement to at least twenty percent of Mesquite's equity shares.

In Phase Two, the parties litigated the validity and enforceability of the secured creditors' pre-petition liens.  The bankruptcy court held that, although valid under Texas law, the correction affidavits failed timely to perfect the pre-petition liens on the HHK Leases and resulted in avoidable preferential transfers pursuant to 11 U.S.C. § 547(b)'s ninety-day lookback period.

Proceeding to Phase Three, the bankruptcy court decided to place a hypothetical value on the debtors' estate of the Phase Two meritorious avoidance claims, as a predicate for allocating the remaining eighty percent of Mesquite's shares.[3]  Expert witnesses testified for each side and presented several valuation theories.  The bankruptcy court, however, charted its own approach and deemed the avoidance actions worth approximately $200 million.  Based on its valuation, the court concluded that the augmented debtors' estate comprised the stipulated $85 million enterprise value plus the $200 million preference action's hypothetical value, plus an additional $2 million recovered from the debtors' insiders.  Accordingly, the court apportioned to the Ad Hoc Secured Creditors and the DIP Lenders 30.27% of Mesquite's share, which constituted the ratio of their stipulated $85 million enterprise value (plus $1 million from the insiders' suit) to the

_____

[2] The bankruptcy court recognized that under the Plan, the DIP Lenders agreed to receive no more than fifty percent of the first $100 million of proceeds recovered in avoidance actions filed by the Creditor Representative against parties *other than* the secured creditors.  At the time of final judgment, those proceeds totaled only about $2 million.

[3] The Ad Hoc Secured Creditors contended that this phase was inappropriate under the Plan and alternatively waived by the Creditor Representative, but the bankruptcy court rejected both contentions.  The waiver issue is not argued on appeal.

augmented value of the estate.  The unsecured creditors' share of equity was 69.73%.[4]

The Ad Hoc Secured Creditors raise an array of issues on appeal.  We need not review most of them.  In particular, we may assume arguendo that the pre-petition HHK liens were in fact avoidable preferential transfers, although the Ad Hoc Secured Creditors raise various arguments against that conclusion.  Nevertheless, it is dispositive that the bankruptcy court's valuation erroneously authorized a double recovery for avoidance of the pre-petition liens.  11 U.S.C. §§ 550(a) and (d) do not permit double recovery.

## DISCUSSION

This court granted direct appellate review of the bankruptcy court's orders and judgment pursuant to 28 U.S.C. § 158(d).  We review the bankruptcy court's legal conclusions de novo and its findings of fact for clear error.  *See In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d 285, 294 (5th Cir. 2013).

The purpose of bankruptcy preference actions is to level the playing field among creditors so that a debtor's assets are unencumbered by debts or liens that arose shortly before a filing.  *See* 7 COLLIER ON BANKRUPTCY § 1100.08 (16th ed. 2023).  The general theory is full of exceptions.  Stated most relevantly for this case, however, "preferential" transfers include any transfer of the debtor of an interest in property made (1) to or for the benefit of a creditor, (2) for or on account of an antecedent debt, (3) while the debtor was insolvent, (4) on or within ninety days of bankruptcy, and (5) that enables

---

[4] Ultimately, according to the Plan's treatment of secured creditors' claims (Class 4), the secured creditors also obtained a portion of the 69.73% shares attributable to unsecured claims.  Nonetheless, well over 50% of Mesquite's shares are not controlled by the DIP Lenders or secured creditors.

the creditor to receive more than such creditor would receive in a Chapter 7 liquidation. 11 U.S.C. § 547(b). If a preferential transfer is "avoided" by the trustee or debtor in possession, Bankruptcy Code Section 550 enables a trustee or its assignee to "recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property." 11 U.S.C. § 550(a). Section 550(d) limits recovery under Section 550(a) to "only a single satisfaction." *Id.* § 550(d).

The parties dispute how these provisions interact, and whether they are even relevant. The Creditor Representative contends that based on the terms of the Plan, Section 550(a) did not apply. Alternatively, the Creditor Representative echoes the bankruptcy court's conclusion that Section 550(a) does not prevent a bankruptcy court from awarding "value" for liens that were worthless when returned to the debtors' estate. The Ad Hoc Secured Creditors respond that the bankruptcy court violated Sections 550(a) and (d) by failing to acknowledge the secured creditors' giving up of their liens and refusing to enforce the "single satisfaction rule." The parties' contentions raise two purely legal questions for this court to consider: (1) whether the Plan eschewed Section 550 by requiring a hypothetical valuation of the preserved avoidance actions; and (2) how the limitations embodied in Section 550 affected the preserved avoidance actions once the secured creditors returned their liens to the estate. We address each question in turn.

## I.

As the bankruptcy court acknowledged, the terms of the Plan were "unusual" in several ways. Foremost, the ultimate equity ownership of Mesquite on emerging from Chapter 11 was dependent largely on the outcome of "Lien-Related Litigation." Art. I.A, Sec. 81. The Plan's Article IV.D articulated the process for handling such litigation, which consisted of the Lien Challenge Complaint Sanchez had filed against the

secured creditors, together with other claims comprising the Lien-Related Litigation. On conclusion of the Lien-Related Litigation, the bankruptcy court would allocate equity shares in Mesquite among the DIP Lenders, secured creditors, and unsecured creditors. Art. III.C., Secs. 3,4, 5.

Also "unusual" was the DIP Lenders' agreement to forego enforcing their DIP liens in return for "equitizing" their position in the reorganized company. Because the stipulated $85 million enterprise value of the reconstituted debtor was far less than their DIP loans, the DIP Lenders could have chosen to foreclose, thereby shutting down the company without reorganization and retaining the underlying oil and gas properties. The secured creditors also gave up their liens in exchange for a share of the unsecured creditors' potential recovery of equity from the Lien-Related Litigation.

The Creditor Representative supports the bankruptcy court's approach as a simple question of plan interpretation. The Plan authorized the bankruptcy court to distribute eighty percent of Mesquite's stock based on, "among other things, the consideration of the value, if any, of any Causes of Action preserved by the Reorganized Debtors pursuant to the Plan." Art. IV.D. A subsequent provision, however, provided merely a standard release and discharge of liens by the secured creditors in favor of Mesquite. Art. VIII.E. To be sure, the Lien-Related Litigation was based in part on preference claims pursuant to Sections 547 and 550 of the Bankruptcy Code. But the Creditor Representative's position is that "valuing" those claims for purposes of the equity distribution was the fulcrum of the Plan. To apply the litigation provisions literally in light of the lien releases would "neuter the Plan's chief concern." For a number of reasons, we disagree that the Plan provided for "valuation" in a vacuum, irrespective of defenses that were available to the secured creditors under the same Plan.

No. 23-20557

The Plan adopts Texas law, in which interpretation begins with the words of the contract. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 888 (Tex. 2019). This Plan permits equity-share allocation to account for the "value" of avoidance actions. Discerning the meaning of that provision requires the court to apply ordinary principles of contract interpretation. *See Compton v. Anderson*, 701 F.3d 449, 457 (5th Cir. 2012) (principles of contract interpretation clarify the meaning of the language in reorganization plans). The Plan does not provide a definition of "value," though dictionaries define the term as "[t]he monetary worth or price of something." BLACK'S LAW DICTIONARY (11th ed. 2019). The "monetary worth" of an unprosecuted avoidance action naturally depends on how that action would fare if it were litigated to a final judgment under the bankruptcy laws. Nothing in the Plan contradicts this natural understanding. In fact, it would be unnatural to hold that the Plan's express incorporation of litigation relating to Sections 547 and 550 was divorced from proper application of those provisions. And on top of that, the bankruptcy court *did* apply Section 547 faithfully both when it concluded that the DIP liens were perfected and enforceable and when it concluded that the original HHK liens were unenforceable as preferences. Application of one subsection of the law should mandate application of its companions for purposes of "valuation."

That Section 550 had to be correctly applied is underlined in the Plan itself. Throughout the Plan provisions that preserved, identified, and described the Lien-Related Litigation, there are qualifications protecting the secured creditors' defenses. The initial definition of Lien-Related Litigation states that:

> For purposes of clarification, nothing in the Plan or the Confirmation Order shall alter, amend, or otherwise limit any rights, claims, or defenses that may or could be asserted by the DIP Lenders [or secured creditors]…in connection with or in

defense of the Lien-Related Litigation, irrespective of whether such rights, claims, or defenses arose before or after the Petition Date and whether provided or arising under the Final DIP Order, applicable agreements, applicable law, or otherwise.

Further, the classes of DIP Claims, Secured Notes Claims, and Unsecured Claims are each entitled to receive equity shares, "if any" based on the outcome of the Lien-Related Litigation. "If any" reinforces the preserved defense rights of the DIP Lenders and other defendants in the Lien-Related Litigation.

Under Art. IV, specifying Plan implementation, the post-effective date stock distribution is likewise qualified by reference to the Lien-Related Litigation and the results, "if any," in favor of the DIP Lenders, secured creditors, and unsecured creditors. Art. IV, C.2. Equally significant, the three-step process for Lien-Related Litigation, Art. IV.D., proceeds from the Phase One determination of issues surrounding the DIP liens to Phase Two, "[i]f the Bankruptcy Court determines that any additional Lien-Related litigation is necessary", and to Phase Three, "[i]f the Bankruptcy Court determines that the valuation of any Causes of Action are necessary." Each step is contingent on the outcome of the preceding step and hardly preordains the necessity of "valuation" at Phase Three irrespective of preceding phases' outcomes. Moreover, Art. IV.D. concludes by stating that, "[n]otwithstanding anything in this Plan to the contrary, in connection with determining the Lien-Related Litigation, for purposes of clarification," all rights and defenses of the DIP Lenders are preserved.

Read in totality, as they must be, the Plan's provisions evince the strong disagreement among the parties as to the enforceability of the secured creditors' liens, and they specifically preserve whatever rights, claims or defenses the secured lenders might assert. To the extent that the Plan's

11

release of the DIP and secured liens bore legal consequences favorable to the secured creditors, those consequences must be respected. Thus, the Creditor Representative—and the bankruptcy court—err in contending that a proper application of Section 550 would be a "self-defeating" threat to dismantle the Plan and to render the "valuation" process superfluous or meaningless.[5] As has been demonstrated, any "valuation" of alleged preference claims was *contingent* on substantiating the claims. In sum, if adjudication proved the unsecured creditors' claims worthless under a proper application of Sections 547 and 550, that result did not frustrate, but implemented the terms of the Plan.

Unlike its argument in this court, the Creditor Representative tended to display its understanding at various points of the bankruptcy court proceedings that resolution of the parties' dispute would not be totally unmoored from Sections 547 and 550. For example, the Creditor Representative acknowledged that the unsecured creditors must establish "avoidance" and "value" under Section 550(a), and then the bankruptcy court must determine "whether to award . . . value synthetically or . . . to return the lien." Sanchez, after all, expressly sought relief pursuant to Section 550 as part of the Lien Challenge Complaint. The Creditor Representative likewise maintained that a decision in favor of the DIP Lenders at Phase One would leave little to litigate: adequate protection, commercial tort claims, and the value of preserved causes of action "against third parties." Consistent with those concessions, the bankruptcy court seemingly accepted as a given that the terms of Section 550 applied. Accordingly, when the Creditor Representative finally raised the possibility

---

[5] These hyperbolic complaints overlook that the Lien-Related Litigation involved additional claims and defendants separate and apart from the challenges to the secured creditors' perfection of their liens. Those disputes were not rendered "self-defeating."

of recovering a hypothetical value award—more than two years after the Plan became effective—the bankruptcy court requested briefing to ensure that the Creditor Representative's claim was not waived. The logical conclusion supported by the Plan's terms and the parties' longstanding interpretation precludes a hypothetical valuation process that augmented the estates' value in disregard of Sections 550(a) and (d).

Another necessary consequence of the Plan is that, when the bankruptcy court reversed course and upheld the DIP liens, not only were the Ad Hoc Secured Creditors entitled to twenty percent of the equity (the minimum specified by the Plan), but they should have been entitled to one hundred percent according to their superpriority liens that covered all of Sanchez's assets. This was ordained by the facts and the Plan. The facts were that DIP Lenders had injected over $100 million in new money to the company post-petition, while the value of the debtors' assets slid to $85 million. The Plan provided an opportunity for the unsecured creditors to recover some equity *only if* they were able to defeat the DIP liens, followed by the HHK leases' liens. The parties crafted Phase One Lien-Related Litigation precisely to adjudicate first the preeminent claim of the DIP Lenders to the debtors' assets, and thus, its equity. And the Plan in no way limited the lenders' ability to mount defenses consistent with Section 550 and other applicable law.

## II.

Because the Plan and the Lien Challenge Complaint must be interpreted in light of Sections 550(a) and (d), and it is dubious in any event that the parties could agree to ignore a controlling provision of the Bankruptcy Code when seeking a preference recovery, we next apply those provisions, which state (1) that the estate may "recover . . . the property

transferred, or . . . the value of such property," 11 U.S.C. § 550(a), but also (2) that recovery must be limited to "only a single satisfaction." *Id.* § 550(d).

The Creditor Representative contends that in Section 550(a), "or" must be used in its conjunctive form to mean "and." Thus, the preference recovery against the secured creditors could include, in addition to the HHK Leases' liens that were returned to the debtors' estate under the Plan, an amount necessary to "recover" the value of the liens at the date of bankruptcy. In other words, the estate could recover "the property transferred" *and* its "value." And this could be done in accord with the "single satisfaction" provision. The Ad Hoc Secured Creditors challenge these points, which we take in turn.

To begin, the Bankruptcy Code's Rule of Construction provision states that "or" is "not exclusive." 11 U.S.C. § 102(5). Courts often apply this non-exclusivity directive when interpreting "or" in other sections of the Code. *See Lac de Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 395–96 (2023) ("Congress has expressly instructed that the word 'or,' as used in the Code, 'is not exclusive.'"); *see also In re Pac. Lumber Co.*, 584 F.3d 229, 245 (5th Cir. 2009); Bryan A. Garner, Dictionary of Legal Usage 639 (3d ed. 2011) (citing Scott J. Burnham, The Contract Drafting Guidebook 163 (1992)) (noting that "A or B" is usually "A or B, or both"). But the Bankruptcy Code, like other statutes, does not apply the background Rule of Construction when surrounding context makes "A and B" logically impossible or dictates otherwise. *See In re Williams*, 168 F.3d 845, 847–48 (5th Cir. 1999); *In re Phila. Newspapers, LLC*, 599 F.3d 298, 324 (3d Cir. 2010) (Ambro, J., dissenting) (collecting examples of the Bankruptcy Code using a disjunctive "or" despite its conjunctive decree).

Section 550(d) furnishes the context for interpreting "or" in Section 550(a). By limiting recovery to a "single satisfaction," Section 550(d) compels the conclusion that Section 550(a) uses "or" in its disjunctive form. Indeed, it is logically impossible to "recover" both transferred property and the "value" of that property as a "single satisfaction." Reading Section 550 holistically, and treating the text as the "alpha" and "omega," this court has held that "[p]roperty that has already been returned cannot be 'recovered' in any meaningful sense." *In re DeBerry*, 945 F.3d 943, 947 (5th Cir. 2019). A trustee cannot use Section 550(a) to recover the value of property that was already returned to the estate. *See In re Provident Royalties, LLC*, 581 B.R. 185, 195 (Bankr. N.D. Tex. 2017) ("[T]he specific purpose of [S]ection 550(d) is to act as a restrictor plate on the roaring engine of recovery provided to the trustee in [S]ection 550(a)."); 2 COLLIER ON BANKRUPTCY § 102.06 n.1 (16th ed. 2023) ("While the canon . . . might, in isolation, be read to allow the trustee to recover both the property and its value, such a result is absolutely prohibited by Section 550(d) which provides that the trustee is 'entitled to only a single satisfaction under subsection (a).'"). This either/or interpretation of Section 550 should alone settle the issue before us. Pursuant to the Plan, when the secured creditors returned their liens to the debtors' estate, they effectuated the estate's "recovery" of a "single satisfaction" for the preferential transfers.

Undeterred, the unsecured creditors, echoing the bankruptcy court, contend that *both* a return of the liens plus the "value" they held at the petition date was required because "[a]ccepting the simple release of the worthless . . . HHK Liens as a recovery . . . [did] nothing to return the estate

to its pre-transfer position."[6]  This unapologetically purposive interpretation finds no support in various general statements that Section 550(a) is primarily concerned about returning the bankruptcy estate to its pre-transfer position.[7] Moreover, the purposive interpretation is not only at odds with the disjunctive meaning of the text, but is also a mischievous interpretation where any preferential transfer involves a lien on a depreciating asset.[8]  As the court made clear in *In re Trout*, 609 F.3d 1106, 1112–13 (10th Cir. 2010), the "property" that is to be recovered under Section 550 is the "perfected security interest."  *Id.* at 1112.  The *Trout* court explained that when a preferential lien is returned to the bankruptcy estate, the estate retains a depreciating asset no matter what.  That is the general rule, and it pertains especially here:  although the HHK liens *appeared* to be worthless, the assets were still oil and gas in the ground, and the assets are still being fought over because their market value rebounded.

Even while acknowledging the discussion in *Trout*, the bankruptcy court purported to distinguish that case because "simple avoidance of the liens on the HHK Leases would not put the estate back in the pre-transfer position."  According to the bankruptcy court, virtually all the secured creditors were also part of the group of lenders that obtained superpriority

---

[6] As has been explained above, due to the COVID pandemic's effect on the oil and gas market, the value of the leases underlying the HHK liens had declined catastrophically between the date of Sanchez's bankruptcy and the confirmation date.

[7] The bankruptcy court did not specifically discuss the disjunctive language of Section 550(a) or the single satisfaction rule in Section 550(d).

[8] Two decisions from the Second Circuit are not to the contrary.  The court in *In re TransCare Corp.*, 81 F.4th 37 (2d Cir. 2023), unanimously agreed that Section 550(a) permits recovery of "either" the transferred property or its value, and the dissent parted ways on a question of double-counting.  *Id.* at 59–60 (Menashi, J., dissenting).  And in *In re Belmonte*, 931 F.3d 147, 154–55 (2d Cir. 2019), the court so interpreted Section 550 but held avoidance possible in regard to post-petition transfers from separate transactions.

DIP liens. These lenders "caused" the "worthlessness" of the pre-petition liens after they had leveraged those preferential liens to enable them as DIP Lenders to secure favorable funding terms. Whether this is accurate or not as a description of the course that DIP negotiations took at the outset of the case, it was not a valid basis for finding "harm" to the estate, especially because no party objected to the Final DIP Order, and it cannot justify ignoring the text of Section 550. The court's analysis perhaps reflected its frustration that unless a trial should be held pursuant to Phase Three of the Plan, the "last few years of litigation" would be rendered "meaningless." There are obvious flaws in this reasoning. First, as demonstrated above, the Plan did not *require* three successive phases of litigation unless the contingencies in each were met. Second, extrinsic considerations cannot change the plain meaning of Section 550. Third, it is inaccurate to portray the Lien-Related Litigation as "meaningless" simply because the unsecured creditors might not receive any equity when the Plan never guaranteed that the unsecured creditors would receive anything at all.

Finally, the great weight of authority contradicts the Creditor Representative's erroneous interpretation of Section 550, which would require bankruptcy courts to calculate a value award in every case that involves the avoidable transfer of a depreciating asset, even if that asset is returned. That has never been the law. *See In re Eleva, Inc.*, 2003 WL 21516983, at *2 (B.A.P. 10th Cir. 2003) (explaining that the remedies in Section 550(a) are "mutually exclusive" even though returned property had depreciated). The Creditor Representative fails to cite any persuasive precedent supporting its position.[9]

---

[9] The Creditor Representative cites one non-binding Florida bankruptcy decision, which held that "the Code permits the court . . . to award *both* a money judgment *and* recovery of the property in kind." *In re Am. Way Serv. Corp.*, 229 B.R. 496, 531 (Bankr.

No. 23-20557

Courts cannot award value under Section 550(a) when the estate has recovered its transferred property in kind. Of course, the provision enables a court in its discretion to select, as alternative preference recoveries, "the property transferred" or "the value of such property." But a value award cannot lie for avoiding a nonpossessory lien when, as in this case, the liens are returned to the estate. *See In re Trout,* 609 F.3d at 1108 n.2 ("[T]he Trustee appears to seek *both* the lien *and* a monetary award of the value of the lien, [but] the Trustee acknowledges on appeal that under § 550(d)—which permits only a single recovery—it . . . would have to abandon the . . . lien if it obtained a monetary award for the value of that lien under § 550."); *In re Patterson*, 2012 WL 1292642, at *3 n.4 (Bankr. N.D. Ga. 2012) ("Of course, if Trustee is allowed to recover from Defendant the value of the Property, under § 550(d), Defendant would retain its lien on the Property."). The bankruptcy court erred in concluding that the unsecured creditors could have their cake and eat it too without violating Section 550(a) and (d).

## CONCLUSION

As a result of the foregoing discussion, the bankruptcy court was required to award the DIP Lenders one hundred percent of the equity in Mesquite, because the value of their superpriority liens exceeded the stipulated enterprise value of the reconstituted debtor. The bankruptcy court's initial wrong turn, avoiding the DIP liens, propelled the parties into subsequent stages of litigation that were unnecessary. But in any event, considering the Phases Two and Three litigation (and still assuming arguendo that the pre-petition liens were avoidable preferential transfers),

---

S.D. Fla. 1999). Like other courts, we view this decision as a rogue outlier. *See, e.g., In re Eleva, Inc.*, 2003 WL 21516983, at *2.

the court also erred in authorizing recovery of the "value" of the pre-petition liens *in addition to* the return of the liens to the debtors' estate pursuant to the Plan.

Accordingly, we VACATE the judgment of the bankruptcy court and REMAND for further proceedings consistent with this opinion.